Case number 20-1337 Christopher Graveline et al. versus Jocelyn Benson et al. Oral argument not to exceed 15 minutes per side. Mr. Grill, you may proceed for the appellants. Thank you. Good morning. May it please the court. Assistant Attorney General Eric Grill, appearing on behalf of the defendant appellants, Secretary of State Jocelyn Benson, Attorney General Dana Nessel, and Director of Elections Jonathan Brader. I would like to reserve three minutes of my time for rebuttal. My argument today is comprised of three main points. First, that the district court should not have decided this case. Second, that if the district court was going to decide it, it should have granted our motion for summary judgment. And then lastly, if the court was not going to rule in our favor, it should not have rewritten the statute in the manner that it did. First, the district court really should have not decided this case on the basis, first and foremost, of mootness. Once the 2018 election had occurred and Mr. Graveline was on the ballot, the court lost its subject matter jurisdiction. Plaintiffs sought a declaration that the combined effect of these statutes was unconstitutional as applied to Mr. Graveline. Plaintiffs, in fact, sought an order placing Mr. Graveline on the ballot for the 2018 election, which they received through the court's preliminary injunction. Once the election passed with Mr. Graveline on the ballot, they received all the practical relief they had requested. There was no longer any live controversy following the election. Was there any indication that Mr. Graveline would want to run again if he lost? There, at least at this point, I'm not aware of any, Your Honor. I don't believe there was any evidence presented in the case of that effect. And at least it's the idea of whether this was capable of repetition but evading review. The problem here is that the necessary showing was that there would be a reasonable expectation that the controversy would recur as to Mr. Graveline. And why is that not the case? If he lost, why wouldn't he want to try to run again? The problem is that because this was an as-applied challenge, it rested heavily on the facts peculiar to Mr. Graveline in this particular attempt. As we detailed in our brief, there were a lot of aspects of his candidacy here that were not compelled by the statute. He started his campaign late, thereby depriving himself of, I think, almost half the time that was permitted him under the statute to gather signatures. As a result, the idea that the combined effect of the filing deadline and the number of signatures is difficult to say that that's going to recur to him unless he chooses to start late again. In election cases, isn't the capable of repetition yet evading review doctrine read with some understanding that elections will always occur pretty regularly and promptly and that we need to have that exception to move this understood in that regard? Elections always recur, but the problem here is that Mr. Graveline's claim is not based on election law facially. It was based on a specific set of circumstances as applied to him. The Supreme Court's decision in the Wisconsin Right to Life case reiterated that it requires the same plaintiffs will be re-exposed to the challenge of illegality. With respect to as-applied claims, the plaintiffs must be able to credibly claim that the future controversy will be materially similar to the old one. That's the problem here is how are these specific facts expected to be materially similar in the future unless Mr. Graveline or some future candidate deliberately halves the time that they have? Well, the reason that he's asserted was that he wanted to have more of a sense of who the major parties were going to nominate before he decided whether or not to run. Why wouldn't that be applicable in the future as well? Well, first, that was only part of his reason. He also acknowledged that part of the reason was also that he was a federal employee and was subject to the Hatch Act. He was trying to put off making the decision as long as possible so he wouldn't have to resign his position. But at least as far as the idea of waiting to see what the other candidates were doing, as we pointed out in our brief, there was plenty of opportunity before Mr. Graveline actually started his campaign for there to be a good sense of who the candidates were. Most of the candidates for Attorney General had already identified themselves publicly, and the Democratic nominee Dana Nessel, there was a pre-convention nomination in April of that year. And still, Mr. Graveline waited, I think, another two months before starting his signature-gathering effort. So at least in that respect, plaintiff's claims were moot and were not likely to recur and should have been dismissed on that basis. Similarly, there was also a standing problem because, again, once Mr. Graveline was on the ballot, what was the injury to the plaintiffs in this case? Again, this was all based on an as-applied challenge. And once the as-applied, you know, as applied to Mr. Graveline, he's on the ballot, there is no longer any injury that would support Article III standing. But Mr. Greel, don't we normally analyze standing at the time the complaint is filed? Well, number one, I think that at the time the complaint was filed, I still would have argued that there wasn't an injury to the plaintiffs on the basis of- Well, no. Answering my question, isn't that what we normally do is we analyze standing at the time the complaint is filed as opposed to later development? Yes, Your Honor, that's correct. But the 2018 election was completed. The plaintiffs no longer had an actual injury that would support the court's exercising its jurisdiction. The claims now depend upon a future candidate who isn't identified in this complaint. Maybe Graveline or some future candidate might start another effort late and may fail as a we run into the standing problem. Okay. I'm concerned that we actually have two orders here. The first order by Judge Roberts allowed Mr. Graveline to be on the ballot with only 5,000 ballot signatures. And that's how he appeared on the ballot. Now, Judge Roberts has concluded that 5,000 is not constitutionally required, that 12,000 is the number that the Constitution requires. But Judge Roberts determined that, assuming this is a page eight of her opinion, assuming a 75% validity rate, this amounted to 12,000. So right now, the district judge says that 12,000 is required under the Constitution. However, we allowed Graveline to appear on the ballot with assuming only 10,600 signatures. So we allowed him really unconstitutionally to appear on the ballot. Graveline received approximately 70,000 votes. The margin between the two top candidates was 115,000. What if Graveline actually had received 116,000 votes rather than a 70? What would be the remedy? I mean, it appears that we illegally put him on the ballot. What would the Secretary of State do had Graveline received 116,000 votes rather than 70,000? I think that probably highlights the problem that we've raised in this case and in this appeal is this was not really something I think the district court should have done. Had that occurred, I suppose once Mr. Graveline was ordered to be on the ballot, he would have been on the ballot. Certainly, the implication being that at that point, the court's order would have effectively determined the outcome of the election. But the order would have been invalid. I mean, right now, the case is postured that according to District Judge Roberts, that the Constitution requires a 12,000 threshold. It doesn't require a 5,000 threshold. Therefore, it appears that we erred in denying a stay, which you requested from the panel. It appears that we should have ruled the other way because he didn't qualify for the signatures required by the Constitution, which is 12,000, according to District Judge. So what would be the remedy? Would the remedy be a new election? Or what if Graveline actually had received 116,000 votes? I think I know what the remedy would be in that circumstance, Your Honor. And I agree with what you're saying, that the idea that the court's determinations in this case ultimately could have much more serious consequences. I said that could seriously affect the election, and there's no redoing it. And I think it's just by luck or happenstance that Graveline didn't get the 116,000. I'm interested, would the remedy be a new election? Or what? I don't, I'm not, candidly, Your Honor, I haven't really given that much thought. I hadn't really considered it before the question. But I certainly, I'm not entirely sure a new election would be legal authority or venue for that to occur. So that's something that could only arise through some other further order of the court. And at least, you know, there's no statutory provision for that to occur. Okay, the fact that the District Court has now changed the threshold from the preliminary injunction to the permanent injunction, does that affect standing, mootness, any of those issues that you've raised? He qualified under the low threshold, but now what we're reviewing is the higher threshold of 12,000. And does that affect your arguments of mootness or standing? Mr. Graveline received, I think he successfully gathered something in the area of about 14,000 signatures. So I think he still would have been above the new threshold that the district applied. But no, he wouldn't be if you assume a 25% error rate, which is what did. So in her opinion, she assumed that he only had 10,600 valid signatures, assuming a validity rate of 75%. And so that was, you know, her fact finding as well. So her fact finding is that he did not get over the 12,000. Which is interesting, because that's what we're talking about. As I think of it, I suppose the argument still is that Mr. Graveline was placed on the 2018 ballot, which was the only practical relief he saw. So at least in that respect, they've been satisfied. They got what they asked for. There was no longer any facial challenge, you know, going forward in future elections. It was an as-applied challenge that they obtained the relief for. And at least as, you know, if I could skip ahead to my third point regarding the 12,000 signature threshold that was set by the district court. Again, in our briefing, the state defendant specifically requested that if the court find that the statute is unconstitutional, please do not create a new threshold. The district court did anyway. And in so doing, it's- Let me ask you this. I mean, she said it expires immediately upon the Michigan legislature, putting a different number on. So it wasn't like a permanent change. It was just an remedy. But what- Let me ask you, what makes the 30,000 that's now in the statute narrowly tailored? Assuming we find a severe burden, where did the 30,000 come from? Has any court ever upheld 30,000? I mean, I know- I think there are other states that have higher numbers. I think they're listed in our brief. I think Arkansas, I think there were others that had higher stakes than what Michigan had. And also Michigan, as compared for the size of its population, its number was, I think, in the 67th percentile. So it was fairly middle of the road for a state of our size. Ohio only requires 5,000, right? In Ohio? Some states have lower, some states have higher. I'm not sure about Ohio's requirements specifically. Mr. Grell, talking about your brief, there seems to be a case right on point as to the standard of 2000 or 2020 case published opinion from our court. I didn't see that cited in your brief. Is there a reason you don't rely on it? Honestly, Kishore, I think, is a relatively recent decision that came up. I think we should have probably addressed that in our reply brief, which was filed. I don't think it had been decided before we filed our principal brief in September. Looking at the Kishore case, does the Kishore case address the interim situation where Judge Roberts' ruling requiring only 12,000 signatures is the relevant ruling? I don't believe so. I believe Kishore addressed the idea of a third party. So it was about the party validation rather than independent, non-affiliated candidates. What do you do with the footnote one in Kishore, which says that the interim signature requirement is still in effect? I take that at the court's words. The interim signature requirement set by Judge Roberts for independent candidates, non-affiliated candidates was still in effect. It wasn't addressed by the Kishore's panel specifically. However, I think the court's rationale in Kishore is well placed. It should be addressed in this case as well. If Kishore said that a 12,000 signature requirement was not a severe burden, and yet Judge Roberts had found that a 30,000 was severe, Kishore does not directly reverse Judge Roberts, does it? I don't believe so, Your Honor. I would have to look at the Kishore decision to confirm that, but I believe that that's correct. I see your time is up. If another judge has a question? No, I don't. Thank you. We'll give you your rebuttal time. Mr. Hall? Thank you, Judge Moore. May it please the court, on behalf of the plaintiff appellees. Our position is that the briefing makes quite clear that these plaintiffs have standing and that their claims are not moot. I don't intend to spend a lot of time on those issues, but I do want to address a couple of points that Mr. Grill just made before moving on to the merits. Mr. Hall, what is your interest in defending the new standard now, which is the 12,000 threshold, when you advocated and were successful on a 5,000 signature threshold? How do you have an interest in upholding the permanent injunction when the preliminary injunction was more favorable to you? And you succeeded. Do you really have an interest in the 12,000 as opposed to the 5,000? Yes, of course, Your Honor. And the reason is that the plaintiffs still have an interest in participating in elections in which independent candidates for statewide office are able to compete without the burden of an unconstitutional statutory scheme being imposed on them. The permanent injunction grants them meaningful relief from that unconstitutional statutory scheme, and they have an interest in defending it. Certainly, it was not the relief that we received at the preliminary stage, but it's still meaningful relief, and we think it's actually reasonable based on the record as the case developed. There was more evidence presented at the permanent injunction stage. Do you admit your client should not have been on the ballot? You're arguing now for a 12,000 threshold. Judge Roberts assumes that you only received 10,600 valid signatures, and therefore, you should not have been on the ballot. Judge Griffin, I want to make a distinction between a judge offering equitable relief as part of an order granting an injunction and a legislature enacting a statute. I don't believe that it's correct to say that Judge Roberts says that Constitution requires 12,000 signatures. I believe the meaning of Judge Roberts' order granting injunctive relief is to say that based on the facts and evidence in the record and the arguments presented by the parties, these plaintiffs are entitled to this relief as a permanent injunction, which will expire when the legislature adopts remedial legislation. But based on the 14th Amendment, I mean, the district judge isn't doing just general equity here, is she? I mean, she's actually enforcing the Constitution, the 14th Amendment. Certainly, Your Honor. Judge Roberts entered this order in an effort to protect the First and 14th Amendment rights that the plaintiffs are asserting, and we believe that this order does provide meaningful relief for those rights. We did request more extensive relief, but that doesn't believe that anything less is sufficient. We believe that this relief is meaningful and a judicious exercise of the district court's equitable power. The reason the district court decided not to enter a permanent injunction setting the interim requirement at 5,000 is that court took special care to account for the state interests asserted by the defendants here, and we think it was an appropriate modification, although it's not the position that we advocated for. Certainly, for the district court to take account of the arguments made by the state during the course of the proceedings and to adjust the relief granted accordingly is an appropriate exercise of the court's power. Mr. Hall, the briefs don't talk about a case which I think is really critical here, and it's the Kishore v. Whitmer case, which is a 2020 published opinion of our court, and it involves independent candidates for president and vice president, but it involves the same statute here. In that case, we held that applying the statute and the requirements of Michigan law, if you look at the text of the opinion as opposed to a footnote, they are evaluating Michigan ballot access laws that we hold are hereby to intermediate scrutiny and the state's interest through its ballot access requirements, and to me, our court assessed the same state law involved here and said it's subject to intermediate scrutiny, not strict scrutiny, and Judge Roberts here applied strict scrutiny. Why are we not required to follow the holding of Kishore that intermediate scrutiny is a standard here? Judge Griffin, the entire point of the Anderson verdict analysis is to make an assessment based on the specific facts and evidence in each case as to the severity of the burden imposed by the statutes and then to determine the state interests that are implicated and to make an constitutionality based on that analysis, which is fact specific, fact intensive, and does not admit of the sort of litmus test type analysis that I think your honor may be suggesting when your honor says that Kishore is controlling here. The fact is that in Kishore, for instance, not only is there the footnote that I referred to earlier, but the text of it says that the district court in this case, Graveline, ordered that the signature requirements for independent candidates be reduced to 12,000, and at no other point in time did the Kishore opinion discuss 30,000 as the numbers. In the beginning, it said in normal circumstances, they would have to obtain 30,000, but in this very same paragraph, it says that the district court in Graveline imposed the 12,000 requirement, and then the court goes on to address how COVID impacts that situation. How can we say that Kishore controls what kind of burden is that? Judge Moore, I believe that's correct, and I would also note that as your honor has just suggested, Kishore's primary focus was on the strict enforcement of Michigan's ballot access laws, the in-person signature requirement as applied during the COVID pandemic. The record in this case is quite different. It arose before the COVID pandemic. It does not address the COVID pandemic. What it largely arises from is the fact that for many years, Michigan had no procedure whatsoever for independent candidates to run for public office, and as a result, this court and federal courts in Michigan routinely ordered the secretary of state to place independent candidates on the ballot as a remedy. That's much more intrusive than what the district court did here, and so when Michigan finally did enact a statutory procedure for independent candidates in 1988 after multiple decisions requiring the state to put independent candidates directly on the ballot, it enacted the present statutory scheme with which no statewide independent candidate has ever complied, and that is one of the most crucial pieces of evidence in the case. It arises, the importance of that evidence arises from the Supreme Court's recognition in Storer v Brown that past experience will be an important indicator of whether a statute is unconstitutionally burdensome. As the court said, it will be one thing if independent candidates are able to comply with some regularity. It will be quite another thing if they have not, and that's what we are dealing with here. We are dealing with a statutory scheme. Mr. Hall, the problem was that I had with your argument is that you offered no proof that these 30 candidates even tried to comply with the statute. The only evidence you have is there were 30 committees formed, but I can't see you sustaining your burden of proof to show that they tried to comply. May I respond? A preliminary point, Your Honor. The figure is 46. It was 46 candidates who formed committees. Not one of them submitted a successful nomination petition, and that 46 figure does not include any candidates for U.S. Senate, and it also doesn't include an entire decade worth of election returns. To answer my question, did you submit any proof that they tried? To answer your question, Your Honor, we did not submit proof with respect to these candidates, but the problem is that that proof is lost to the mists of history when candidates attempt to comply. It's your burden of proof. I looked at some of these candidates' committees. The first one is Terry Link in 1989. He formed his committee October 20, 1989, way past the deadline. There's no reasonable argument that he would have tried to get the signatures. He's past the deadline. The next one is Michael Wagenlander, who formed his committee on October 29, 1989, also way past the deadline. The next one is Don Mackle in 2002, formed his committee August 20, 2002. We've got Robert Jones, October 2, 2006, for the 2006 election. We have all sorts of committees that were formed with no realistic chance of getting signatures, and obviously they weren't serious about doing it. So to say we have numbers here, it shows that it was not serious candidates, and there's no evidence that they tried. A lot of them were not even in the time frame that they could have done it, had they wanted to. So I'm just not impressed with the number of the committee here. Am I missing something here? Mr. Hall, you're frozen. I don't know if you're still there. We're checking. You scared them to death, Judge. Deputy Orme, thank you. Council Hall, stand by, your honors. Judge Moore, when he comes back, let's please give him his time back. Oh, yes. We probably lost that. It's the first time we've had a glitch in a while with the Zoom. I'm sorry. Can everyone hear me? Yes. So, Mr. Hall, we're going to give you a couple of minutes  to deal with this glitch. But to summarize, Judge Griffins raised a number of individuals who he says had no realistic chance, who were non-serious candidates, who were not in the time frame. And then I asked you if you would respond to that situation. So if you would start up from there, that would be great. Thank you, your honor. The first response is it may be that some of those but the important point is that we are not required to demonstrate proof that these candidates were all written reasonably diligent, made reasonably diligent efforts. In fact, the standard announced by the Supreme Court in Storer v. Brown is simply that past experience will be a reliable indicator of whether ballot access statutes are reasonable or whether they are not. The Supreme Court itself, and to my knowledge, neither this court nor any lower federal court has ever required specific proof that candidates attempted to comply but failed to comply. Rather, courts rely on the fact that candidates have not complied. And when you're talking about a period of 30 years that we have in this case, no candidate has ever complied with this statutory scheme since it was enacted. The suggestion that that's simply because every candidate in that entire 30-year history was not reasonably diligent does not comport with, I think, common sense and also with the standard that the Supreme Court announced. It does not require evidence of specific proof that specific candidates attempted but failed. But what we do have here is evidence relating to Mr. Gravlin, who certainly was a reasonably diligent candidate. Mr. Grill has made much of the fact that he didn't use the entire statutory petitioning period, but that's part of the problem with this statutory scheme. It's why this court said that this case is more like Libertarian Party of Ohio and less like Lawrence. In order, by the defendant's own evidence, in order to have any chance to comply with this statutory scheme, a candidate would have to announce his candidacy and start petitioning at full bore on the very first day of the petitioning period sometime in January. And that is exactly what contributes to the burden imposed by this statutory scheme. It's an unequal burden because the major party candidates don't have to do it. They don't have to. Mr. Hall, is that the evidence as to your client himself? I mean, my understanding is that your client collected 14,157 signatures in approximately a six-week period from June 5th to June 19th. And so he collected almost half of what he needed in just a month and a half. And he had 180 days. But if you actually look at that, he obviously could have gotten 30,000 had he started a month or two earlier, just by his own rate, the rate of the signatures that he got. I think your client's own experience here shows that the 30,000 was very achievable. In fact, he would have achieved it had he just started a little bit earlier. Isn't that really the best evidence that your client was on track to do it? You could see how many signatures per day he got through this period. And if you just go back a little bit longer, obviously the 180 days is plenty of time for him to get the signatures. He would have done it. We believe that's incorrect. And the reason it's incorrect is that a reasonably diligent candidate is not a candidate who has unlimited resources. Our client, Mr. Gravlon, expended $38,000 in an effort to get the signatures he got. In order to finance a successful petition drive, the evidence shows that an independent candidate would have to spend somewhere on the order of a quarter of a million dollars, $250,000. Didn't he get 10,000 from his own volunteers, your client? Not that many, your honor. He got something less than that. He was close to 10,000 just by his volunteers. And if you go back that, that would be three months just volunteers. Political campaigns do cost money. I mean, whether you're a partisan campaign or independent campaign, I mean, there's money that's involved. I don't think your argument is that the laws have to be such that no funds have to be expended. Your honor, we're not talking about a political campaign. We're talking about the cost of ballot access, complying with ballot access procedures that would enable you to launch a political campaign. And what the evidence shows in this case is that volunteer efforts are unlikely to succeed. That's what the defendant's own expert witness conceded. And therefore you're going to have to hire professionals. And if you pay the $6 per signature, the district court based its figures on $3 per signature, half the amount that Mr. Gravelin actually paid. And the figure came to be $250,000. That's not the cost of a political campaign, Judge Griffin. That's the cost of entry just to be able to launch a political campaign. So it's an important distinction. We are talking about the financial burden that the state imposes upon candidates who merely seek to participate in the election process, not candidates who are already qualified and then have to spend money to compete against their opponents. And that's a key part of the burden here. The Supreme Court has long held that statutory schemes that impose what is in effect a mandatory financial burden on voters, candidates, and political parties are unconstitutional. That's why the Supreme Court struck down poll taxes in Harper v. Board of Elections. It's why the Supreme Court struck down mandatory filing fees for candidates in Bullock v. Carter. And it's why the court has struck down statutes that require political parties to pay for their own primary elections. The fact is that the state is not permitted under the Constitution to impose what amounts to a mandatory financial burden. And when the court suggests that if this plaintiff, Mr. Gravelin, simply spent more money, he could have qualified with this statutory scheme, my response is respectfully that is not a constitutionally permissible procedure under Supreme Court precedent. It would be constitutionally permissible for 12,000 signatures to be required by the state. And that would be a financial burden as well, would it not? But that would be a permissive financial burden as opposed to unconstitutional one. I mean, your argument that there shouldn't be a financial burden, well, there's going to be one with 12,000. Your Honor, there are always line drawing issues in these cases. And under the facts of this case, it appears that Mr. Gravelin would have come somewhere close to 12,000 signatures. He did spend some money. But whether a 12,000 figure imposes an unconstitutional financial burden or not is not the issue here, because we're not asserting that and neither are the defendants. What we're asserting is that the 12,000 figure was a reasonable exercise of the court's equitable discretion to balance the state's legitimate interest. What did 12,000 come from? How did Judge Roberts come up with that figure as opposed to 15,000, 10, eight, seven, six? How did she just pick 12? Your Honor, district court judges do have wide discretion to enter equitable relief. I believe that she looked at the statutory scheme. She recognized that Michigan, by means of its legislature, has recognized or acknowledged that 12,000 signatures is sufficient to protect its regulatory interests for districts with residents of 4,999,000. But then that same statutory scheme jumps to 30,000 for districts with one voter more, 5 million. And based on that arbitrary distinction- 9 million or 10 million? What's the population of Michigan now? Somewhere around 9 million, Your Honor. Okay. I don't understand the rationale of one more person than 5 million when we have 9 million. We have twice the population than she based it on. I think she followed the architecture of the existing statute and used that as a baseline for awarding the relief here. The legislature has determined that if a district has one more voter than 4,999,000- No, but we had 4 or 5 million more than that. So I don't understand why we would go back to the 5 million. And again, Judge Griffin- It doesn't make any sense to me, that's all. Again, Judge Griffin, this is not a legislature enacting a legislative scheme. This is a judge awarding equitable relief as the result of a successful constitutional challenge to a statutory scheme. As Judge Roberts herself correctly, I think, observed, her interim measure will expire immediately upon the legislature enacting a legislative remedy. And so the ultimate resolution here should come from the legislature, and I think the district court decision properly recognizes that. Okay. Thank you. I think we've taken you beyond your time, and we appreciate your answers. It's now time for rebuttal. Thank you. And in his argument just now, Mr. Hall suggested that he didn't need to show that the candidates who failed to- the 30 candidates or 46 candidates who've gathered committees and didn't submit successful petitions, that they made reasonable efforts. I think that's incorrect. He wants to rely on those same people to show that the burden is too high, but the standard that has to be applied and standard that was actually articulated in Storer v. Brown was whether a reasonably diligent independent candidate could be expected to satisfy the requirement. So that's the question. That's the issue of whether or not 30,000 or 12,000 or 5,000, what is the appropriate number that a reasonably diligent independent candidate can be expected to meet? Unfortunately, there is no discussion of that standard in Judge Roberts' decision. And the problem as a result is that not only is the district court's 12,000 signature requirement untethered to the legal standard that we're expected to apply, but it also provides very little guidance to the state legislature on what number will pass constitutional measure. What is the legislature to do? We know that, according to Judge Roberts, the 30,000 is too high and 12,000 is okay. But where between 12,000 and 30,000 does the state run afoul? There's no analysis. There's no guidance and ability for the legislature to find its way.  to craft a new set of provisions. Well, I think what's important to note is that by the time that Judge Roberts issued that decision, the 2018 election had already concluded. And at that point, the appropriate thing and what we'd actually ask would have been for the court to make its determination, find the statute unconstitutional, and allow the Michigan legislature to make its own determination. So you would have preferred that she simply declare the statute unconstitutional without having any interim remedy? And then any independent candidate could have their name on the ballot, I would presume, would be the answer until the Michigan legislature actually acted. Yes. And I think there are circumstances. How does that satisfy the state interests in any way when the state purports to be fearsome, fearing a plethora of independent candidates? I'm not going to slam the door entirely and say that the courts can never apply an interim remedy. But the circumstances here, when this order was issued, there was no impending deadline. There was time for the legislature to act. It was not incumbent upon the court to impose this interim deadline because there was an imminent election coming. She didn't impose an interim deadline. She imposed an interim requirement, which would evaporate as soon as the state acted. So it would seem to me that her order was terribly beneficial to the state, as opposed to something that you would be criticizing when the alternative would be to declare that the 30,000 requirement was unconstitutional and null and void. What I'm suggesting is that the interim signature requirement was unnecessary. There was not an impending time frame in which there would be this large gap of no signature requirement and nobody knowing what to do. The legislature would have been able to impose its own new requirement in time for the 2020 election. Tell me this, Mr. Has the state legislature yet acted on this point? It has not. And I couldn't give you a reason why other than to say that it's been an unusual year. I think the other thing, too, as I mentioned, it's hard, I think, for the legislature to be free to impose. One of the concerns of imposing the 12,000 signature requirement is that it suggests to the legislature that this is the line to which they should adhere. And I know that Judge Roberts in her decision says, well, no, no, they can pick their own number. But my problem and my question is how, without any analysis in the court's opinion of what a reasonably diligent independent candidate could be expected to do, how is the legislature supposed to pick a number between 12,000 and 30,000 that it can be reasonably sure satisfies constitutional requirements? And that gets back to, I think, the earlier question about the Kishore case. If the panel in Kishore was going to adopt the 12,000 signature requirement, I think the panel would have said so. Nothing in that opinion suggests that its ruling hinges upon there being 12,000 signatures instead of these statutorily stated. The panel certainly did not say it was applying the 30,000 number. Correct. Well, the panel in its footnote recognizes that the number was 12,000, but I think that if the panel is going to say our decision rests upon this being 12,000 instead of 30,000, I think they would have said so. Well, they said in the text that the district court in Graveline imposed the 12,000 limit and then went on to analyze whether or not the 12,000 limit was a severe burden. And that makes sense in that if District Judge Roberts thought that the 30,000 was a severe burden but that the 12,000 was not a severe burden, of course in Kishore they would reach the conclusion that 12,000 was not a severe burden, that it was an intermediate burden. So it seems that we, as recognized in Kishore, we have the issue in front of us, which the two of you have ably argued to us your opposing points of view, and we have peppered you both with questions showing that we are thoroughly engaged in this case and we appreciate your arguments. So unless there's another judge with questions for the rebuttal. Nothing further here. Then we thank you both for your effective arguments and we say please take yourselves off of our virtual courtroom and we will issue a decision in due course.